[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings:
The Department of Children and Youth Services (hereinafter referred to as "DCYS") seeks to terminate the parental rights of Bernadette D. Pecor and Reginald Pecor, Jr. (hereinafter referred to as the "respondent parents"), as to their minor child, Reginald Pecor, III (hereinafter referred to as "Reggie"). He was born on July 4, 1987 at the Danbury Hospital, and on July 20, 1987 he was placed in foster care by DCYS under an order of temporary custody.
On September 21, 1987, he was adjudicated neglected and uncared for as defined in section 46b-120 of the Connecticut General Statutes and was committed to DCYS for eighteen months pursuant to section 46b-129 (d) of the Connecticut General Statutes.
The petition for termination of their parental rights (hereinafter "TPR") was filed by DCYS on April 5, 1990 and amended on October 15, 1990, pursuant to section 17a-112
(formerly 17-43a) of the Connecticut General Statutes. The TPR petition alleged all four grounds contained in this statute:
1. Abandonment
 That the child has been abandoned by the parents in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
2. Failure to Rehabilitate
 That the child has been adjudicated neglected and uncared for in a prior proceeding and the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering CT Page 9698 the age and needs of the child, the parents could assume a responsible position in the life of the child.
3. Parental Commission or Omission
 That the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral, or emotional well-being.
4. No On-Going Parent/Child Relationship
 There is no on-going parent/child relationship, which means the relationship that ordinarily develops as a result of parents having met on a day to day basis for the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interests of the child.
 DCYS must prove at least one of these grounds by clear and convincing evidence, which must have existed for at least one year, unless waived under (c) of section 17a-112 of the Connecticut General Statutes.
The respondent mother was represented by counsel and a guardian ad litem, both court appointed. The respondent father was represented by counsel provided to him by the Connecticut Prison Association. Both these attorneys prepared and filed comprehensive and well reasoned briefs. The Court commends them for the extensive legal research and the presentation of facts and arguments most favorable to their client.
The trial was held on July 22, 1991, July 23, 1991 and August 5, 1991. DCYS called the following witnesses: Dr. Ralph S. Welsh, Ph.D., a licensed clinical psychologist who evaluated the child; Mrs. Margaret Corbett, the child's foster mother; Dr. Barry Russman, M.D., a pediatric neurologist from Newington Children's Hospital; Dr. David Mantell, Ph.D., a licensed psychologist who evaluated the parents; and Dr. Jules Golden, M.D., the psychiatrist who evaluated the mother. CT Page 9699
The respondent parents did not testify and they called only one witness in their behalf, Mrs. Beth Kalogeras, a parent aide, who supervised visitation between themselves and their child.
By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption . . . ." Section 17a-93 (e) of the Connecticut General Statutes. It is a most serious and sensitive judicial action. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 436 A.2d 290 (1980). "`Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children `undeniably warrants deference and, absent a powerful countervailing interest, protection.'" In re Juvenile Appeal (Anonymous),177 Conn. 648, 671, 420 A.2d 875 (1979). The standard of proof in an action to terminate parental rights is clear and convincing evidence, or as sometimes stated, clear and positive proof. Section 17a-112 (b) of the Connecticut General Statutes. In re Juvenile Appeal (84-BC),194 Conn. 252, 255; In re Theresa S., 196 Conn. 18, 24, n. 5; In re Juvenile Appeal (83-BC), 189 Conn. 66, 72; In re Juvenile Appeal (84-6), 2 Conn. App. 705, 708, cert. denied,195 Conn. 801. See also Santosky v. Kramer, 455 U.S. 745,747-48. Section 1049 of the Connecticut Practice Book states: "The allegations of an application to terminate parental rights shall be proved by clear and convincing evidence." Clear and convincing evidence has been described as a level of proof that lies between the usual civil requirement of a fair preponderance of the evidence and the criminal standard of beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234. Proof by clear and convincing evidence means proof of a quality that is sufficient to convince the court beyond an average certainty that the respondents' rights as a parent should be ended. In re Juvenile Appeal (84-3), 1 Conn. App. 463, 468. The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence in order to prevail on the petition. In re Juvenile Appeal (84-3), supra, 463, cert. denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Sec. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re CT Page 9700 Juvenile Appeal (84-AB), 192 Conn. 254, 259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine the validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition. The dispositional phase takes into account the best interests of the child, and the court is permitted to take into consideration events which had occurred after the filing of the petition to the time of trial.
Adjudicatory Phase: The court will consider the relevant and material evidence and find facts from July 6, 1987, the date the case was first referred to DCYS, to October 15, 1990, the date the TPR petition was amended. Further findings of fact will be made in the dispositive phase of this decision.
On July 6, 1987, two days after Reggie was born at Danbury Hospital, the social worker for this hospital called DCYS concerned that the child was at risk because of the parents' bizarre behavior. The mother had been a mental patient in the psychiatric unit on many prior occasions, and the father's aggressive behavior at the hospital caused her to file a report of suspected abuse. The case was assigned to Ms. Aleta Markham, a social worker with DCYS, who has been working on it since that time. On July 14, 1987, Dr. Brian Quigley, M.D., a consulting psychiatrist at Danbury Hospital, told her that the father was extremely paranoid and hyperactive and that the family situation was potentially explosive. They both refused psychiatric treatment and the father would not be psychologically evaluated unless it was court ordered. Based on a sworn affidavit by Ms. Markham who recited these facts, an order of temporary custody was obtained on July 20, 1987. At first, the court allowed Reggie to stay with the mother because she and the father would be living in Brookfield with her grandparents. Shortly thereafter, on July 21, 1987, both these parents and the child left the state and were found at a welfare office in Ossining, New York. With police assistance, the child was taken from them and placed in foster care in Connecticut where he has remained to this time. A court ordered evaluation was prepared by Dr. Robert S. Colen, Ph.D., a licensed psychologist, which was filed in court on September 21, 1987. He concluded that the mother was suffering from schizophrenia which had caused her to be hospitalized in the psychiatric unit of Danbury Hospital on at least four occasions, having been recently released after a suicide attempt. He found the father to be paranoid and belligerent. He said the father admitted a number of incarcerations for CT Page 9701 burglary, sexual assault and breach of the peace. He found that their past history and present behavior placed the child at risk and recommended that Reggie remain in foster care and that all visitations be supervised by DCYS. (State's Exhibit A.) Based on Dr. Colen's evaluation, Ms. Markham prepared social agreements which were signed by both parents in late September, 1987 (State's Exhibits C 1 and 2), and a treatment plan (State's Exhibit B-2). They both agreed to enter a psychiatric treatment program at Danbury Hospital, attend couples' counselling, and to weekly visitations with the child and obtain housing. Ms. Markham testified that the original treatment plan was to reunite them if they complied with these requirements, and in the beginning they satisfied most of them. But in November of 1988, both of them began to violate them and their behavior deteriorated. From Ms. Markham's testimony and her social study (State's Exhibit B), the court finds the following facts as to the mother:
1. She stopped attending the required psychiatric treatment program at Danbury Hospital and taking medication for her illness. This resulted in her being admitted to the psychiatric unit at Danbury Hospital on November 23, 1988. She was then transferred to Fairfield Hills Hospital on December 17, 1988, where she remained until the end of that year. The original diagnosis there was schizophrenia, paranoid type, chronic substance abuse and borderline personality disorder. She was released but returned as an inpatient staying from June 27, 1989 to May 25, 1990. She was four months pregnant at the time of this admission and gave birth to a second son, Bernard Pecor, on November 16, 1989, who was committed to DCYS and has been in foster care since birth.
2. In April, 1989, she stopped her supervised visits without any explanation to Ms. Markham and waited until July, 1990, about fourteen months before requesting they be resumed.
3. She has been unable to be gainfully employed or obtain housing.
As to the respondent father, the court makes these findings of fact:
1. From the date his son was born, July 4, 1987 to October 15, 1990, he did not provide him with any adequate home nor any support nor did he obtain employment.
2. In October, 1987, he told DCYS not to schedule any further visits because he had to work, then changed his mind CT Page 9702 and began visiting him in February, 1988. In November, 1988, he requested visitation be reduced to one hour per week and stated to Ms. Markham that his first priority was to work and that his son was being taken care of. His last visit with his son was January 3, 1990. Between January, 1990 and January 28, 1991, he failed to keep in contact with Ms. Markham or DCYS as to where he was living, did not inquire about his son in any manner nor visit him.
3. On August 16, 1990, the respondent was convicted and sentenced to five years in jail, suspended after two years and serve two years of probation.
The first ground alleged by DCYS in the TPR petition is abandonment, which is defined in section 17a-112 (b)(1) as a parent's failure "to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. . . ." This definition changed the common law concept of abandonment when a permanent and total intent to abandon had to be proved. Litvaitis v. Litvaitis, 162 Conn. 540,547. In the case of In re Juvenile App. (Docket No. 9489),183 Conn. 11, 14, 15 (1981), the Supreme Court stated that the focus to be considered is parental conduct, which is a question of fact for the trial court. In re Rayna, M.,13 Conn. App. 23. "The statutory standard is not whether the parents have shown some interest in their children. Common sense dictates that a parent's obligations toward his or her children go further than a minimal interest. . . . `The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.'" In re Rayna M., supra, 36, 37. Both parents at various times during the past thirty-six months have expressed love and affection for Reggie in words and during visitations. But they have not fulfilled the other requirements that involved acts or conduct that speak so much louder than words when it comes to meeting the daily needs of a child like Reggie. They have failed to meet the other four minimal requirements as required by In re Rayna M., supra, 37, as outlined above. At best, their efforts to meet his needs on a daily basis were minimal.
The mother did not see her son after April of 1989 and failed to keep in contact with him or DCYS. The father never saw him after January 3, 1990 and never contacted him by letter or through Ms. Markham, the DCYS social worker. Their CT Page 9703 conduct, at best, showed sporadic displays of interest in Reggie and fell far below the statutory standard. In re Rayna M., supra, 37. The court finds from clear and convincing evidence that the respondent parents have abandoned their son under this ground.
The second ground alleged for termination is that after the uncared adjudication on September 20, 1987, the respondent parents "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." Section 17a-112 (b)(2) of the Connecticut General Statutes. This statutory ground now requires that a parent rehabilitate within a "reasonable time" and "the age and needs of the child," which words were added as amendments to this statute effective October 1, 1983. Formerly, there was no time set for the parent to regain a responsible position in the child's life. In re Rayna M., supra, 32. The general effect of this change was to reduce the time for the parent to reform his behavior and for the court to also consider the needs and the age of the child. He has a vital interest to develop his life constructively within a reasonable time and is equal to giving a parent a reasonable time to rehabilitate. What is a reasonable time is a question of fact to be governed by the circumstances in each case and the age and needs of the child is another question of fact for the court to decide in this particular case. In re Shannon S., 19 Conn. 20 (1989), and In re Luis C.,210 Conn. 157 (1989). A period of over thirty-six months passed from the time these respondent parents signed service agreements with DCYS and treatment plans prepared for their rehabilitation.
This child is classified as a special needs child by Dr. Ralph Welsh, Ph.D. and the testimony of Ms. Corbett, the foster mother, and Ms. Markham was not contraverted. Reggie is suffering from muscular dystrophy and is hyperkinetic. He is now four years and three months old and is in a special education program in school. In order to walk, he has braces for his leg and feet and must use a walker. For him to attend school, these braces must be in place each day. His therapy must also be daily and consistent in order for his muscles to strengthen. This regimen is vital to avoid curvature of his spine and contracture of his muscles. A parent must be available to do this physical therapy each day. He is also hyperkinetic, which is organic in nature, and makes him extremely disruptive. His foster mother testified that he often has temper tantrums, throws himself on the ground, screams, kicks, and goes out of control. At CT Page 9704 the same time, he is of superior intelligence and can be manipulative. When he returns from school, he needs three to four hours sleep. In his psychological evaluation, Dr. Welsh concludes that Reggie needs a strong parent who can satisfy these behavioral and physical needs on a daily basis. (See State's Exhibit A.)
The evidence from which the court found the ground of abandonment can be considered for this ground. In re Shannon S., supra, 20. Since 1983, the mother has been hospitalized for her mental illness at least ten times at Danbury Hospital. Mrs. Pecor has had a sad and troubled life. She was first admitted to Fairfield Hills on December 17, 1988 for about two weeks. The second admission was from June 27, 1989 to May 25, 1990. Her history in the social study cites bizarre behavior, noncompliance with medication, substance abuse, all which started at an early age. The diagnosis was schizophrenia, chronic, undifferentiated, with acute exacerbation; substance abuse and borderline personality disorder. During her hospitalizations at Fairfield Hills, she had many behavioral problems, occasionally went AWOL, and on November 16, 1989, while a patient, she gave birth to Bernard, her second son by the respondent father. He was committed to DCYS and placed in foster care immediately following his birth. She also had three children from a prior marriage to Robert Petrini: Bridget, born on December 5, 1980; Robert, born on December 15, 1981; and Justin, born on July 15, 1983. They were divorced on November 9, 1982 in the Superior Court at Danbury and the custody of these three children was awarded to their paternal grandmother. On November 1, 1984, she married Hunter Black and divorced him shortly thereafter. In January, 1989, she married this respondent father and these two sons, Reggie and Bernard, were born to them.
Mental illness, in itself, is not a basis for termination of parental rights, but it may be properly considered when determining whether a parent's mental deficiency or illness renders them incapable or unable to provide the child with necessary care. In re David E.,4 Conn. App. 653; In re Theresa S., 196 Conn. 18. It is significant as to whether a person has the ability to parent a child. In re Nicolina T., 9 Conn. App. 598, 607. According to a child-parent interaction evaluation made on April 5, 1989 by Robert S. Colen, Ph.D., he concluded that it was unlikely that either of these parents would ever gain the requisite skills and emotional stability to warrant regaining custody of this child. She last visited with him on April 12, 1989 and Ms. Markham did not know where she was until July 20, 1989 after she was told by her mother that she was CT Page 9705 hospitalized in Fairfield Hills. She had been an inpatient at this hospital from June 27, 1989 to May 25, 1990, about eleven months. On July 31, 1989, she left there without permission and went to Florida. She was returned to the hospital by interstate transfer. She has not been able to make but minimal or marginal improvements to her behavior after numerous hospitalizations according to Ms. Markham.
From September 20, 1987, when the child was adjudicated uncared for to October 15, 1990, the date this petition was amended, is more than three years. She has been unable to make any meaningful progress to assume a responsible position in this child's life. During this period, she could not hold a job nor obtain housing. She received state assistance and social security disability benefits to support herself when she was not hospitalized. As previously stated, her compliance with the social service agreement deteriorated after the first year as did her visitations. Based on these facts, the court finds that the evidence was more than clear and convincing to prove this second ground, a failure to rehabilitate.
Similarly, the father's conviction and five year jail sentence on August 16, 1990, in itself, would not terminate his parental rights but is one factor to consider in the total picture. The mandated social study by Ms. Markham indicates an extensive arrest record both before and after the uncared for adjudication on September 20, 1987, including burglary, sexual assault, larceny, criminal mischief, and hindering prosecution. He failed to show any interest whatsoever in the child for over one year during this thirty-six month period. He has not held a job, established a home, or provided any financial support for his child. When he was not in jail, he also received social security disability benefits. The court finds that the evidence against him on this ground is also clear and convincing and more than enough to prove his failure to rehabilitate.
The third ground DCYS alleged for termination is that by reason of an act or acts of parental commissioner omission, this child has been denied the care, custody, or control necessary for his physical, educational, moral or emotional well-being. Section 17a-112 (b)(3) of the Connecticut General Statutes. The same evidence that DCYS presented to support the grounds of abandonment and failure to rehabilitate can be used to establish any other ground. But when the original petition for termination was filed on April 5, 1990, the child had been in foster care since July 20, 1987, in fact, his entire life, except for the first sixteen days. DCYS did not prove by clear and convincing CT Page 9706 evidence that the respondents' acts of omission established in the other two grounds affected this child's physical, educational, moral, or emotional well-being as required under this ground. All these needs were being met by the foster parents. Therefore, termination on this ground is denied.
The fourth ground alleged by DCYS, the absence of an ongoing parent-child relationship, requires clear and convincing proof of the absence of a relationship "that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral, and educational needs of the child. . . and that to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interests of the child." If the first part of the statutory language was to be taken literally, a non-custodial parent would never be able to satisfy that requirement. In re Luke G., 40 Conn. Sup. 316 (1985). These respondents are in the non-custodial category and this ground contemplates situations where no relationship with a parent ever existed, or when it had existed it was subsequently completely lost or displaced. Initially, proof of a lost or displaced relationship required the child to have present memories or feelings for the parent, In re Juvenile Appeal (Anonymous),181 Conn. 638, 646, but now also requires specific memories and positive feelings. In re James T., 9 Conn. App. 608. The existence of positive feelings depend on the viewpoint of the child. In re Rayna M., supra, 35. From the testimony of Beth Kalogeras, a parent aide, who supervised visitation for these respondents for about two years from October, 1987 to December, 1989, stated that these parents interacted appropriately with Reggie and he referred to him as "Daddy" and the child enjoyed being with his mother. Dr. Robert S. Colen evaluated them in August, 1988, and recommended increasing the visitations. Instead, the father asked Ms. Markham to reduce them to one hour a week because getting a job was to be his priority. He did not obtain a job and even these one hour visits became less frequent, and the last visit with him was January 3, 1990. He had no contact of any kind with him for the next thirteen months. In April, 1989, the mother went out of his life without giving Ms. Markham any reason, failed to contact her, or the child for the next fourteen months. By failing to see him during these long periods of time, the court finds that any positive parent-child relationship that existed in August of 1988 has been displaced, basing its finding on the testimony of Ms. Markham and Ms. Corbett, the foster parent. This child has been with the same foster parents for over four years and three months. From their testimony, the court finds that the foster parents are for all practical purposes his parents, CT Page 9707 meeting all of his emotional, moral, physical and educational needs, and to allow any further time to re-establish a parental relationship with his biological parents would be contrary and detrimental to his best interests. At the time of trial, the respondent father was in jail serving a five year sentence and the mother was hospitalized for her mental illnesses at Fairfield Hills. This child should not be deprived of stable and permanent caretakers any longer. The facts also proved this fourth ground by clear and convincing evidence.
Even though DCYS has proven three of the four grounds for termination, the court must further find by clear and convincing evidence that it is in the best interests of this child that the respondents' parental rights should be terminated after considering the six factors set forth in section 17a-112 (d) of the Connecticut General Statutes.
1. Section 17a-112 (d)(1)
The timeliness, nature and extent of services offered or provided to help facilitate reunification. DCYS prepared eight treatment plans and several service agreements for these parents to rehabilitate their lives. (State's Exhibits B-1 thru B-8 and Exhibits C-1 thru C-3.) They included drug and psychiatric treatment at Danbury Hospital Mental Health Clinic, couples' counselling, supervised visitation, and a parent aide to help them acquire parenting skills. These services began in September, 1987 when the child was placed in foster care because of their inability to care for him.
2. Section 17-a-112(d)(2)
The terms of any court order or agreement between the parent and the agency and the extent to which the terms have been met. The respondents initially fulfilled the expectations of the treatments, plans and service agreements of September, 1987. But beginning in April, 1989, the mother voluntarily stopped taking drug medication, failed to attend counselling and therapy sessions at Danbury Hospital, and her behavior continued to deteriorate whereby she became an inpatient at Fairfield Hills Hospital. She had her last visitation with her son in April, 1989. The father also voluntarily ceased accepting DCYS services and he stopped seeing his son in January, 1990, and for the next thirteen months he never visited with him. The court ordered psychological evaluations for these parents was completed by Dr. David M. Mantell, Ph.D. and the psychiatric evaluation on the mother was completed by Dr. Jules Golden, M.D. Dr. Ralph S. Welsh, Ph.D. did a psychological evaluation for the child. CT Page 9708
3. Section 17a-112 (d)(3)
The feelings and emotional ties of the child with his parents. According to Dr. Mantell's report (State's Exhibit E), and from his testimony at trial, the child does not know them as parents and that his foster mother, Mrs. Margaret Corbett, is his psychological parent. She has cared for him for the past four years, his entire life, except for the first sixteen days after his birth. She and her husband have provided for all his emotional, moral, physical and educational needs on a daily basis. Reggie is now bonded to them.
4. Section 17a-112 (d)(4)
Reggie was born on July 4, 1987, is now four years and three months old.
5. Section 17a-112-(d)(5)
Both parents have been unable and unwilling to adjust their circumstances, conduct, and conditions to have the child returned to them in the foreseeable future. Because they have made requests to DCYS for resumption of visitation, both have failed to rehabilitate their behavior to a responsible level to insure the safety and welfare of the child. The mother fails to take required medication for her mental illness which has resulted in three inpatient hospitalizations at Fairfield Hills Hospital during the past two years. The father has also dropped out of the child's life in 1990-1991 without explanation and provided no care or support whatsoever. He has been in jail on two occasions for drug convictions during this time and was incarcerated at the time of the trial. The mother is presently confined as a mental patient at Fairfield Hills and, consequently, neither she nor her husband can provide for their own needs let alone their son. Neither of them is capable or has the necessary skills to meet the child's special needs. Reggie is hyperkinetic and suffers from muscular dystrophy. He requires physical therapy on a daily basis, needs braces on his legs and uses a walker. He is in a special education program at the school he attends because of his disabilities but he is an intelligent and determined child who demonstrates a strong desire to overcome them. Neither of the respondent parents have been able to develop the parenting skills to do all that is required to meet the specialized needs of this child.
6. Section 17a-112 (d)(6) CT Page 9709
Neither DCYS nor any other person has prevented these parents from developing or maintaining a relationship with their child nor was it due to economic circumstances. The agency has provided all services that are available for them to rehabilitate their behavior beginning in September, 1987. They both decided to cease accepting them in early 1989 by their own volition. Because their conduct resulted in both being institutionalized for long periods of time from 1989 to the present, their own conduct was responsible for Reggie remaining in foster care for the past four years.
After considering all the above factors, the evidence is clear and convincing that termination of their parental rights is in the best interests of this child. He deserves the care, nurturing and security of a secure and permanent family that is available to him through adoption.
Disposition
The court will consider all of the evidence to August 5, 1991, the time of trial.
After considering these six factors, the evidence is clear and convincing that termination of the respondents' parental rights is in the best interests of this particular special needs child. After having lived with his foster parents for all but sixteen days of his life, he needs and is entitled to the security of having a permanent home and the security of adoptive parents which can be provided to him.
In this regard, Dr. David M. Mantell, Ph.D., a licensed clinical psychologist, examined both parents on July 17, 1991 and testified at trial that their parental rights should be terminated. His testimony confirmed his written report dated July 19, 1991 (State's Exhibit E) in which he stated: "The data obtained from this first evaluation of the father and mother is consistent with termination of parental rights. The basic reason for this is that both parents suffer from chronic mental disorders that require institutional care and preclude their active and continuous involvement in child care activity. The nature of their disorder is such that were they to have access to a child it is unlikely that they would be able to appropriately care for a child even for short periods of time." Mr. Pecor admitted to him that it is in Reggie's best interests to have an "unflinchingly stable home life" and to be able to grow up in the same home in which he now resides. As to Mrs. Pecor, Dr. Jules S. Golden, M.D., a psychiatrist at Fairfield Hills Hospital, testified she suffers from major psychiatric disorders that have required three inpatient admissions at CT Page 9710 this hospital during the past thirty-six months and ten previous hospitalizations at Danbury Hospital. As of June 24, 1991, the diagnoses were schizo-affective disorder, bipolar type; polysubstance dependence, by history; border line personality disorder. In his opinion, her mental illness is chronic and may last for her entire life. Because of these long-standing psychological and emotional disorders, complicated by substance or drug abuse which have required frequent hospitalizations, he concluded that she is incapable of providing a stable and reliable home for a child. The expert testimony of clinical psychologists and psychiatrists is entitled to great weight in termination proceedings. In re: Nicolina T., supra, 605.
Therefore, it is ordered that the parental rights of Reginald P. and Bernadette P., the biological parents of Reginald P., III, be and are hereby terminated. It is further ordered that the Commissioner of DCYS be appointed statutory parent pursuant to section 17-112 (1) of the Connecticut General Statutes for the purpose of placing the child in adoption as soon as possible. DCYS is ordered to submit a report in writing with this court within ninety (90) days of the date of this judgment and thereafter not less than every six months until such adoption is finalized.
Petroni, J.